# Exhibit B



IMPROVING WORKPLACE CONDITIONS THROUGH

# STRATEGIC ENFORCEMENT

A REPORT TO THE WAGE AND HOUR DIVISION

DAVID WEIL  BOSTON UNIVERSITY
PRINCIPAL INVESTIGATOR

# IMPROVING WORKPLACE CONDITIONS THROUGH STRATEGIC ENFORCEMENT

**A REPORT TO THE WAGE AND HOUR DIVISION**
MAY 2010

DAVID WEIL, BOSTON UNIVERSITY
**PRINCIPAL INVESTIGATOR**

| **LEAD PROJECT TEAM** | **ASSISTED BY** |
|---|---|
| RAE GLASS | TUCKER DEVOE |
| AMANDA PYLES | CLAIRE GERSON |
| MIN WOONG JI | HUEY WU |
| ANNE KLIEVE | JEFF LI |
| | JIE ZHENG |
| | SAM KORNSTEIN |
| | CARLOS MALLO |

© David Weil, Boston University, May 2010

# TABLE OF CONTENTS

**ACKNOWLEDGEMENTS** ............................................................................................................**iv**

**INTRODUCTION AND REPORT OVERVIEW**................................................................................**1**
Key Findings...............................................................................................................................**1**
Central Recommendations ......................................................................................................**2**
Setting Industry Priorities .......................................................................................................**2**
Enforcement Strategies............................................................................................................**2**
Organizational Requirements..................................................................................................**3**
Report Organization .................................................................................................................**4**

**SECTION I: THE ENFORCEMENT CHALLENGE**..........................................................................**5**
Internal Challenges ..................................................................................................................**5**
Enforcement Budgets and Investigation Resources ...........................................................**5**
The Rise of Performance-Based Regulation .........................................................................**8**
Changes in the Enforcement Landscape...............................................................................**9**
Fissuring of the Employment Relationship ...........................................................................**9**
Declining Union Representation ...........................................................................................**10**
Current Regulatory Framework out of Synch with Industry Composition .......................**10**
Changing Technology and Work Design...............................................................................**11**
Limits of Traditional Approaches to Enforcement...............................................................**11**
Recovering Back Wages .........................................................................................................**11**
Four Criteria for Evaluating Strategic Enforcement............................................................**16**
Conclusion ...............................................................................................................................**17**

**SECTION II: VULNERABLE WORKERS, FISSURING AND INDUSTRY STRUCTURE**.....................**18**
The Vulnerable Workforce .....................................................................................................**18**
Concentration of Workplace Vulnerability ..........................................................................**19**
Vulnerability and the Fissuring of Employment..................................................................**20**
Vicarious Liability and Further Incentives for Devolution .................................................**23**
Fissured Workplaces, Vulnerable Workers...........................................................................**24**
Implications for WHD Policy..................................................................................................**26**



# THE ENFORCEMENT CHALLENGE

The challenges facing enforcement agencies within the DOL are longstanding and arise from factors both internal and external to workplace agencies. Historically, the WHD has measured its success—and indeed been evaluated by others—largely by the extent of back wages it recovers for workers. This emphasis on returning to workers the wages they rightfully earned continues to be important but, as we will argue in this section, such an emphasis is no longer sufficient for maximizing the protections WHD might provide vulnerable workers in this country.

In this section, we first talk about internal challenges facing WHD and other workplace agencies, and then a series of external challenges that have changed the landscape for regulators. We then discuss some of the limits of traditional approaches to enforcement before introducing four new criteria that we see as critical for strategic enforcement of the FLSA: prioritization, deterrence, sustainability, and system-wide impacts.

## Internal Challenges

Economics is the study of achieving objectives in the face of limited resources, so to say that limited budgets for workplace agencies represent a major and longstanding problem is simply a statement about the basic challenge facing any agency. However, those resources have become more limited over the same period when the number of workplaces covered by laws has grown, creating extremely challenging circumstances. What is more, changes in regulatory oversight over the last decade—ranging from the Government Performance Review Act of 1996 (GPRA), to the expanding role played by the Office of Management and Budget (OMB) and the Office of Inspector General—have raised performance expectations and the level of scrutiny facing the WHD and other workplace agencies.

### ENFORCEMENT BUDGETS AND INVESTIGATION RESOURCES
The fundamental challenge facing the WHD and most workplace regulatory agencies arises from limitations in resources available to them relative to the size and scope of U.S. workplaces covered by relevant statutes. This is true even though resources for the WHD have recently increased. Through reduction in the size and role of the federal and state workplace agencies, employers and industry sectors face a trivial likelihood of investigation in a given year. Reduced enforcement, in turn, diminishes the pressure for regulatory compliance in many sectors, thereby contributing to the growth of vulnerable workers in the economy. One can see a demonstration of this longstanding challenge by reviewing trends in enforcement.[2]

Budgets for enforcement for the WHD and the other major DOL regulatory agencies have been limited for more than a decade. Real spending for enforcement of the four major DOL regulatory agencies (WHD, Occupational Safety and Health Administration, Mine Safety and Health Administration, and Office of Federal Contract Compliance) went from $283 million (in 1982-84$s) in 1998 to $292 million in 2007, representing a

2. Unless otherwise noted, all figures reported in this section are based on analysis of data from the WHD's Wage and Hour Investigative and Reporting Database (WHISARD). To the extent possible, we use data from 1998 to 2008 in order to show trends over as long a period of time as possible. When there were questions about the reliability of WHISARD data in earlier years, we restricted our analysis to the time period 2003 to 2008. Included for analysis are all cases with FLSA findings (including findings of "no violations") and closed by the end of fiscal year 2009. We do not include investigations for which FLSA findings were not recorded, e.g., those cases with only child labor findings.

real increase of 3.1 percent. This tiny change in real expenditures for enforcement is indicative of long-term stagnation in budgets allocated to enforcement, going back to the late 1970s. In fact, as shown in Figure 1.1, average enforcement budgets for the four major workplace programs listed above have been either flat or declining in constant dollar terms from the Carter administration in the late 1970s through the end of the Bush II administration.[3]

While real resources going towards enforcement stagnated, the number of workplaces and workers in the U.S. economy grew, increasing from 6.94 million establishments in 1998 to 7.71 million in 2007, representing an 11 percent increase. Over the same period, the number of paid employees in the U.S. rose from 108.1 million to 120.6 million or 11.5 percent between 1998 and 2007 (U.S. Department of Commerce, County Business Patterns).

Long-term budget restrictions have constrained the resources available to agencies for enforcement. The upper panel of Figure 1.2 presents the number of total investigations (complaint and directed) conducted by the WHD over the last decade. Investigations declined substantially from the middle of the Clinton administration to the end of the Bush II administration, falling overall from 49,521 investigations in 1998 to just 25,852 in 2007. Measuring this reduction in investigations

compared to the overall growth in establishments implies that the rate of investigations per establishment declined by about 53 percent over this period.[4] The lower panel of Figure 1.2 plots the number of WHD investigators on board at the end of each fiscal year and the average number of investigations per investigator over the same period. The number of investigators fell from 942 in 1998 to 731 by 2008, representing a 22 percent reduction. At the same time, the number of investigations handled per investigator also fell dramatically, from 53 to 32, or almost 40 percent over the period.

The falling number of investigations and investigators means even well-known employers (to say nothing of the 'garden variety' workplace) face little chance of seeing an investigator. For example, the likelihood that one of the top twenty fast food restaurants (e.g., McDonald's, Burger King, Subway) receives an investigation is about 0.008 in a given year (Ji and Weil 2009). But the more pernicious impact is that employers operate under an expectation where government investigators or other regulatory agents like unions are simply not seen as a matter of first order concern.[5]

---

3. Numbers from *Budget of the U.S. Government*, Various Years, for reported spending for enforcement by the Occupational Safety and Health Administration, the Mine Safety and Health Administration, the Wage and Hour Division of the Employment Standards Administration (ESA), and the Equal Employment Opportunity enforcement effort of the ESA. All numbers are in constant 1982–84 dollars.

4. Not all establishments are covered by the FLSA so this comparison is approximate. However, since it is likely that the rate of increase in covered establishments grew at about the same rate as overall establishment growth, the estimated change in the rate seems a reasonable estimate of the decline.

5. Other industrial nations face the same enforcement challenge due to the declining presence of government regulators and growing number of workplaces. For example in the UK, "Each year since 1999-2000, HM Revenue and Customs [the government agency in charge of minimum wage enforcement] has made around 5000 visits to an employer ... There are around 1.6m employers in the UK. Therefore a typical employer can expect a visit from HMRC once a millennium." (Metcalf 2008, p.499).

---

**FIGURE 1.1**

## DOL Enforcement Spending by Program and Presidential Administration, 1977–2007

[Constant millions of dollars]



Source: *Budget of the U.S. Government*, Various Years (Constant 1982–84 dollars).

**FIGURE 1.2**

## WHD Cases, 1998–2008
Number of Cases (Thousands)



Source: WHISARD data. Includes cases registered fiscal years 1998 to 2008 and closed by end of FY2009. This may lead to undercounting of investigations in FY2008.

## Number of WHD Investigators and Cases per Investigator, 1998–2008
Number of investigators                                                                          Cases per investigator



Source: WHD (staff numbers at end of each FY); WHISARD. Includes cases registered fiscal years 1998 to 2008 and closed by end of FY2009.



**FIGURE 1.3**

## WHD Cases by Major Industries, All Cases 1998–2008

Share of all cases, 1998–2008 (Percent)

Source: WHISARD data. Includes cases registered fiscal years 1998 to 2008 and closed by end of FY2009.

Much of investigation activity during the period 1998-2008 was concentrated in industries with significant numbers of low-wage workers. Figure 1.3 portrays 10 major industries receiving investigations over the last decade. The five top industries listed on the figure—eating and drinking, retail trade, manufacturing, health care, and construction—constituted 54 percent of all WHD investigations. The concentration of investigations in these sectors is desirable given that, as we discuss in Section II, a significant number of vulnerable workers are employed in them. However, those sectors made up an estimated 58 percent of employment for all low-wage workers, implying that even greater emphasis on them (or more strategic approaches to these sectors) might be desirable.[6]

Compounding these resource limitations is the fact that a significant percentage of WHD investigations arise from worker complaints (Figure 1.4). The WHD has seen an increase in the number of enforcement actions resulting from complaints, from 70 percent in 1998 to over 75 percent in 2008 (but down from a high of 78.6 percent in 2004). While responding to complaints is, of course, critically important to the complainant and thus a priority for the WHD, complaints do not always lead WHD to the right place—in terms of finding serious violations and the most vulnerable workers or in terms of maximizing chances that the expenditure of WHD resources will lead to increasing, sustained compliance. Section VI discusses a variety of reasons why underlying problems prevent many workers from using their right to complain under the FLSA.

6. Distribution of low-wage workers based on estimates by Osterman (2008); employment data for wage and salary workers based on U.S. Department of Labor, Current Employment Statistics. See Table 2.1 for more detail.

Although most complaints relate to real problems, there is nothing to say that they represent problems of the highest order if compared to those workplace problems that, for one reason or another, are not reported via complaint processes. In fact, prior studies by Weil and Pyles indicate no correlation between the prevalence of overtime violations of the FLSA and industry-level complaint rates (Weil and Pyles, 2005, 2006). Additionally, complaints are often driven by specific problems facing a particular worker. They may or may not be related to more systemic issues and even if they are, investigations arising from a complaint may not be perceived as part of a larger systemic problem. This compounds their reactive nature.

### THE RISE OF PERFORMANCE-BASED REGULATION

Public attitudes and expectations towards regulatory agencies have shifted dramatically over time. Regulatory discussions have adopted the language of the private sector and regulatory agencies are increasingly judged—rightly or wrongly—by measures akin to those applied to businesses. The public, through their elected representatives, demand that agencies demonstrate that they have achieved performance outcomes given the resources they have been granted. This has played out institutionally in many ways. For example, the U.S. Office of Management and Budget, in its role in reviewing agency proposals as it assembles the annual federal budget, plays an increasingly prominent role as arbiter of performance through its use of benefit/cost analysis of regulatory initiatives.

Since the Clinton administration, executive agencies have engaged in formal annual planning cycles, mirroring strategic planning exercises in the private sector. Most departments of



**FIGURE 1.4**

## Complaints as a Percent of All WHD Cases, 1998–2008

Share of all cases (Percent)

Source: WHISARD data. Includes cases registered fiscal years 1998 to 2008 and closed by end of FY2009.

the government now require their agencies to set out specific performance goals for upcoming fiscal periods, and those goals are increasingly being tied to budgeting processes.

As a result, performance-based criteria have become an intrinsic part of the appropriations and review process. Workplace agencies are increasingly being asked to demonstrate their contributions (in measurable terms) to larger economic development and societal goals. These requirements, often introduced as part of larger public service reforms, are frequently accompanied by the threat of downsizing programs that are unable to demonstrate these connections (Von Richthofen 2004). For example, the U.S. Congress explicitly built performance into its appropriations process via the Government Performance and Results Act (GPRA) of 1993. GPRA's legislative purpose is "… to provide for the establishment of strategic planning and performance measurement in the Federal Government, and for other purposes." With its ultimate objective stated to be "… to change agency and managerial behavior – not to create another bureaucratic system …" the Act requires federal agencies to submit a five-year strategic plan in 1997 and every three years thereafter, as well as annual performance plans.

Although the impacts of new methods of oversight on agency management and performance are disputed, they have become an institutionalized part of the appropriations and budgeting process.[7] As a result, agencies must justify their budgets, actions, and annual performance not only by traditional input measures like the number of investigations conducted or back wages collected, but on metrics

7. See, for example, Behn 2003.

regarding impact on workers or the larger incidence of underlying problems. Agency managers are also evaluated each year based partly on their progress related to GPRA goals. This creates new challenges—and a higher bar—for showing impact.

## Changes in the Enforcement Landscape

Four major changes in the landscape surrounding WHD and DOL regulatory agencies have further compounded the difficulties of improving conditions at U.S. workplaces. These changes are: the breaking up (which we call "fissuring") of the basic employment relationship in many sectors of the economy; the decline of unionization; changes in the economy that have made the set of regulations on the books increasingly out of synch with realities on the ground; and changes in technology with significant consequences to the organization of work.

**FISSURING OF THE EMPLOYMENT RELATIONSHIP**
The relationship between worker and employer has become more and more complex as employers have contracted out, outsourced, subcontracted, and devolved many functions that once were done in house. Like rocks weakened and split apart by the passage of time, employment relationships have become deeply "fissured" in many sectors that employ large numbers of vulnerable workers. Multiple motivations underlie this change. The use of subcontracting, long used in construction, has become widespread in sectors ranging from building services to the hotel and motel industry. In some cases, subcontracting is motivated by a business decision to focus on "core competencies." In other cases, it arises from a

desire to shift labor costs and liabilities to smaller business entities or to third-party labor intermediaries, such as temporary employment agencies or labor brokers. Finally, studies have documented increasing misclassification of workers as independent contractors and related practices as a means to subvert compliance with labor policies, including required payment of payroll taxes, workers compensation, and other employment-related taxes (e.g., National Employment Law Project 2004; Ruckelshaus 2008; Zatz 2008; Government Accountability Office 2009).

Regardless of motivation, fissuring in employment relations dramatically complicates the regulation of workplace conditions. Major workplace policies assume clear relationships between employees and employers (or at least managers representing employers). Those setting workplace policies, supervising production, setting schedules, and evaluating workers are assumed to directly represent and report to the owners (private) or responsible parties (public/non-profit) of record. Such clear lines of accountability have become murky and establishing the employer of record in order to assess responsibility has become more complicated. This creates significant problems for a workplace agency where foundational statutes like the FLSA assume that most employer-employee relationships are between easily identified parties. Consequently, the task of bringing regulatory pressure on the "employer" has become elusive. This change is discussed in far greater detail in Section II.

### DECLINING UNION REPRESENTATION

Labor unions play an active role in workplace regulation. Typically, unions play this role by advocating for new or revised workplace regulations through the political/legislative process. Generally, they also play a decisive role in assisting workers to exercise rights granted them by government, such as by triggering workplace inspections through complaints, facilitating interactions with workers, and participating in inspection-related administrative processes.[8] Many studies demonstrate that labor unions play a critical role in helping to implement a variety of workplace policies (see Weil 1991, 1992, 2005).[9]

Since the 1980s, declines in union density have been well-documented, in both developed and developing nations.[10] Declining union membership decreases the political leverage of labor in many countries, reducing the legislative support for workplace-related policies. It also reduces union presence and undermines union strength at the workplace level, thereby decreasing trade union ability to play crucial roles in assisting workers to exercise statutory rights. As a result, the decline of labor/trade union movements reduces the capacity of regulators to oversee the workforce—an implication of union decline that is often overlooked in policy debates.

### CURRENT REGULATORY FRAMEWORK OUT OF SYNCH WITH INDUSTRY COMPOSITION

Workplace policies reflect the times in which they were developed. Many regulatory systems, including the FLSA, were designed in an age where the typical employer was a business entity like General Motors, characterized by large workplace establishments, stable workforces, expectations of career employment, fixed facilities, and clear structures of employment responsibility and liability. But for much of today's workforce, General Motors has little in common with the typical employer. First, employment has shifted away from manufacturing to service, health care, and other non-manufacturing sectors—many of which employ large numbers of low-wage, less-skilled workers. These sectors are driven by economic and competitive factors very different from those that drive their manufacturing counterparts.

Second, employment often takes place in smaller, more decentralized units. This partly reflects the fissuring of employment relationships and rise of the informal sector described above. But it also reflects differences in how production and work are organized in non-manufacturing sectors. Child care and home health care are often undertaken in community-based facilities or private homes. More than one-half of calories in the U.S. are consumed outside of the home, fueling the growth of the eating and drinking sector, where employment typically numbers around 40 people per establishment. Even among large employers, the nature of work is far different from the factory model, best exemplified by the fact that the single largest private-sector employer in the U.S. is now Wal-Mart.[11]

---

8. Unions play this role by providing information and assistance to covered workers regarding workplace rights under laws; through their role in administering collective bargaining agreements; and by being designated as employee representatives in administrative procedures. Unions play this role most explicitly under the Mine Safety and Health Act, which requires a designated miner representative to participate in investigations. Local union officers or health and safety committee members typically play this role in unionized mines.

9. The relationship between the labor movement and labor agencies varies markedly across countries. In some cases, unions act as important complements to the government (e.g., in Scandinavian countries with strong labor ministries and sophisticated labor movements). In other cases, unions virtually substitute for a weak labor agency (Bjorn and Graham 2005). A far more expansive role for unions and

workers advocates in enforcement is discussed in Fine and Gordon (2010).

10. For example, in the Anglo-American countries between 1995 and 2004, private sector union density declined from 10.4 to 7.9 percent in the U.S.; from 22.2 to 18.0 percent in Canada; from 21.6 to 17.2 percent in Great Britain; from 45.0 to 28.2 percent (2003) in Ireland; from 25.1 to 16.8 percent in Australia; and from 19.8 (1996) to 12.0 percent in New Zealand. See Boxall, Haynes, and Freeman (2007), pp. 208-209.

11. Work relations within Wal-Mart are clearly characterized by a very different blend of practices, which challenge the traditional model of regulation. On one hand, like General Motors (GM), Wal-Mart operates on a huge scale, employing hundreds of thousands of workers in large, fixed facilities. Unlike GM, Wal-Mart's nonunion workforce receive low compensation and minimal benefits and accept far greater uncertainty regarding the duration of their employment. Like GM, Wal-

**CHANGING TECHNOLOGY AND WORK DESIGN**

Technological changes have always shaped the work environment, and every age seems to view new technology as creating greater disruption and dislocation than experienced in any previous era. However, the present wave of information-based technology change, and its associated impact on work and organizational design, is distinctive in how it makes duties and responsibilities of workers in many industries more fluid within the workplace (i.e., who is responsible for what activity) and between the once clear work/home boundary.

Changes in technology and work organization obviously have many implications for the regulation of workplace health and safety for an agency like OSHA. But they also raise difficult questions for WHD in (1) determining and tracking hours of work, when an increasing part of work in many jobs is done from home via computers, after the close of normal business; (2) determining and tracking hours worked for multiple employers that sometimes operate independently and other times operate under related business entities (such as third-party management companies); and (3) determining exemptions under the FLSA, particularly as they relate to supervisory and management activities of workers.

## Limits of Traditional Approaches to Enforcement

Traditional enforcement approaches are based on investigations having two types of effects. First, an investigation changes the behavior (compliance) of the individual employer being investigated directly through the finding and correction of past violations. Back-wage findings are designed to restore wages owed to workers retrospectively. Civil monetary penalties for repeat or willful violators, and injunctive actions or settlement agreements are intended to ensure that employers comply in the future. Second, an investigation has deterrence effects on other employers who are making compliance decisions. Raising the probability of investigations—which other employers may become aware of either through the communication efforts of the DOL or through their own communications with other employers in the same industry and/or geo-

graphic region[12]—increases the incentives for an employer to comply even absent an investigation. The potential of being assessed civil monetary penalties provides further incentives to comply if such penalties impose significant costs on employers. An investigation may also have deterrence effects when, after its completion, the DOL issues a press release that includes the violations found and penalties assessed—a signal to all employers that they could also receive negative publicity for any violations found.

**RECOVERING BACK WAGES**

The primary recourse under the FLSA is recovery of back wages owed to workers for underpayments of minimum wage, overtime, or other statutory obligations. For many years, the WHD has been evaluated by external constituents—and indeed has measured its own success—primarily through amounts of back wages it recovers (in addition to overall numbers of cases concluded). The recovery of back wages is extremely important for workers the WHD is trying to protect. But given what we now know about preventing underpayment of wages in the first place, we argue that a focus on back wage recovery, while necessary, is no longer sufficient for a goal of sustainable improvement in FLSA compliance.

Analysis that has been done for this study focuses exclusively on compliance with the minimum wage and overtime provisions of the FLSA. We do not analyze child labor or MSPA findings, for example; we have studied industry structures as they relate to compliance with minimum wage and overtime and isolated only those WHISARD cases that have reported FLSA findings (including FLSA findings of "no violations.")

For the years 2003 to 2008, average back wages per investigation were $15,823.[13] However, this average includes only those investigations in which monetary violations were found. If, on the other hand, we include all investigations concluded in this time period, average back wages found due were $8,838 per investigation. The large difference is explained by the relatively high percentage of investigations where no monetary or record-keeping (RK) violations of the FLSA were cited. We do not illustrate how average back wages per investigation has changed over time, as this measure can be easily skewed by a particularly large case in a given year. Rather, we show in Figure 1.5 the percentage of no violation cases: Between 2003 and 2008, about one-quarter (24.6 percent) of all investigations found no violations (i.e., no monetary or RK violations).[14] This

Mart uses outside contractors for some functions, but unlike GM, those functions might be to provide services that are core to business operations. Like GM, the company relies on an enormous network of suppliers for its core business, all of which are dependent on the corporation for a significant percentage of their business. Unlike GM, however, those relations are at once arms-length (i.e., they are suppliers of products to Wal-Mart and autonomous corporate entities, as opposed to the vertically-integrated or closely-held firms within GM's historic supplier structure) and yet operate under elaborate and stringently-enforced guidelines from the retailer that dictate everything, including logistics arrangements, product identification methods, packaging and marketing decisions, and methods of floor display.

12. These could include communications with formal employer associations such as NFIB or the National Restaurant Association.

13. Cases registered fiscal years 2003 to 2008 and concluded by end of fiscal year 2009. Excludes conciliations.

14. Our estimation of "no violation" cases is a count of cases, excluding conciliations, with no back wage (minimum wage or overtime) and no record-keeping violations. Although it includes only those cases with FLSA as the registration act, it may include cases that had violations of the FLSA other than minimum wage

calculation is very close to the way the WHD characterizes and counts no violation cases.[15] The average of 24.6 percent reflects a decrease in the percentage of no violations cases over time—from 28.9 percent in 2003, to 20.5 percent in 2008, which is a positive trend.

The percentage of no violations cases differs dramatically across investigation types: While an average of 20.7 percent of complaint cases find no monetary or RK violations, almost one-third (30.7 percent) of directed investigations find no monetary or RK violations of the FLSA. One important factor that helps explain these differences is the different ways that the two types of investigations are triggered. Investigations that result from worker complaints are much more likely to find violations than directed investigations because of two "pre-screening" processes. First, a worker has stepped forward, often in the face of reasonable fears of repercussions for taking such actions, because of a perception that his or

her rights have been violated. Second, the WHD has decided, through its intake process, that the claim is of significant enough nature to warrant a visit by an investigator rather than resolution by conciliation, typically a phone call.[16]

Although directed investigations often target sectors or areas where there is a belief significant violations are present, the targeting of individual workplaces within that sector or area typically benefits from less information—certainly less information than WHD has for a typical complaint investigation, before which investigators have discussed certain details of the workplace and alleged violation(s) with complainants. As a result, investigators face a higher chance that any given directed investigation will not yield back wage findings. However, it is also true that for those investigations where violations are found, average back wages per directed investigation are far higher than in comparable complaint-based investigations.[17]

A narrow reading of Figure 1.5 would be that directed investigations are less desirable because of the lower chance of finding back wages, implying that the overall predominance of complaint investigations serves WHD's larger aims. As

---

or overtime, e.g., those related exclusively to child labor. The modest difference between our estimate of no violation cases and WHD's estimate is likely attributable to the fact that we have not isolated and excluded those cases with CL—but no back wage or RK—violations.

15. There are other ways of characterizing "no violation" cases, however. Another way of thinking about no violation cases is to look at those cases that were found to have zero back wages due workers (i.e., they might have had only record-keeping violations). If we isolate those investigations registered under the FLSA with no back wage violations, we find that 31.4 percent of investigations find zero back wages due workers, instead of 24.6 percent cited above. If we break down these investigations between complaint and directed, we find that 25.8 percent of complaint cases and 40.3 percent of directed cases found no back wages due.

16. Between 1998 and 2008, about 55 percent of complaint investigations were handled through conciliations. These cases were often last paycheck disputes involving individual workers.

17. For example, among those cases with back wage violations, the average back wage finding for a complaint investigation in the period 1998-2008 was $5,615, versus $18,025 for a directed investigation. Even after excluding conciliations, directed investigations found, on average, $4,608 more in back wages than complaint investigations.

---

**FIGURE 1.5**

## Percentage of No-Violation Cases, 2003–2008

Share of all cases (Percent)



**Fiscal Year Registered**

● All Cases  ● Complaint Cases  ● Directed Cases

Source: WHISARD data. Includes cases registered fiscal years 2003 to 2008 and closed by end of FY2009.
Includes cases with FLSA as registration act and with no back wage or RK violations. Excludes conciliations.

---

we argue below, that interpretation fails to recognize important opportunities offered by directed initiatives and indeed some advantages they have over complaint investigations for improving long-term compliance.

Making sure that workers who have been underpaid—or not paid at all—get paid is of course fundamental, so increasing back wage recovery over time is a laudable objective. But recovery of back wages per se should not be defined as the principle objective of WHD. If the factors that lead employers to decide not to comply with laws do not change, then investigators are forever cleaning up after a system that remains broken. An apt analogy would be to occupational health and safety. Although workers compensation policies provide benefits to workers who have been hurt at the workplace and whose earnings have been impacted, the ultimate objective of health and safety policy (including OSHA) is to reduce (i.e., prevent) injuries and fatalities in the workplace, not simply to ensure that those injured are compensated (as important as that objective is). Enforcement that only cleans up past noncompliance but does not alter behavior puts investigators on a hamster wheel: running very fast and working very hard, but not advancing the larger aim of protecting and enhancing the welfare of the Nation's workforce. Traditional enforcement focused on a back wage recovery objective must therefore be challenged.

Effective enforcement policies must change employer behavior so that practices that result in underpayment of wages do not occur in the first place. This requires addressing the underlying factors that lead to lost back wages and other violations of labor standards.

---

## Enforcement Actions, Tools and Deterrence

The second foundation of traditional enforcement is deterrence. In addition to requiring the payment of back wages to employees, the FLSA provides additional enforcement tools such as monetary penalties, temporary restraining orders to prevent the shipment of "hot goods," injunctions to compel future compliance, and a prohibition against intimidating employees who complain. These tools, when uniformly and consistently used, can work to deter violations from occurring in the first place and to reduce violations by prior violators.

Due to data limitations in certain parts of WHISARD, the extent to which some of these tools have been utilized is difficult to evaluate. Improved reporting of this information by WHD and SOL in WHISARD is important to future evaluation of their impacts on compliance. However, it is important to discuss these significant enforcement tools, how they have the potential for protecting vulnerable workers and influencing employers' behavior to comply, and how they can relate to deterrence and the broader goal of improving workplace conditions.

The FLSA gives the DOL the authority to initiate civil litigation to recover back wages and to supervise the payment of back wages.[18] Therefore, an employer's refusal to pay back wages even after found by the WHD does not mean that vulnerable workers will not be ultimately be paid. The knowledge that the DOL might seek court action may influence employers to avoid costly litigation and pay the back wages owed.

The DOL also has the authority to seek injunctions in U.S. District Court to prevent future FLSA violations. Court orders compelling future compliance reduce the necessity to expend WHD's limited resources for reinvestigations and are particularly useful for multi-branch and large enterprises, which are prevalent in the industries discussed in this paper.

In addition to civil litigation, the FLSA provides for criminal prosecution for willful violations. A conviction can result in a fine of not more than $10,000, imprisonment for up to six months, or both.[19] Although the assessment of monetary penalties discussed below is less burdensome, the knowledge within the employer community of a criminal prosecution that demonstrates DOL's commitment to improving compliance can be a useful deterrent, as was proven in the New York City garment manufacturing community.

The FLSA also has a "hot goods" provision, which prohibits the shipment in interstate commerce of goods produced in violation of the FLSA. This provision is particularly useful in bringing pressure to bear not only on the violating employer but also on upstream customers of such goods to remedy violations and ensure prompt payment to underpaid workers, as we will discuss in Section III.

With respect to monetary penalties, the FLSA provides that employers can be liable for liquidated damages (LDs) in an amount equal to the back wages. Unlike civil monetary penalties, LDs are paid directly to the affected employees. These LDs are an especially important benefit to low-wage and vulnerable workers. Further, these LDs could significantly increase the employers' cost of violating the law, which for some may have the effect of swinging the pendulum towards complying with the law.[20]

Another enforcement tool that can affect deterrence is the FLSA provision that employers who repeatedly or willfully violate the minimum wage and overtime requirements of the Act may be subjected to civil monetary penalties (CMPs)

18. The law also provides for private right of action.

19. Imprisonment is only upon a second conviction.

20. Once again, limitations in WHISARD make it difficult to reliably estimate the use of LDs, where applicable, in the past. For example, for cases concluded fiscal years 2003 to 2008, WHISARD data imply that less than one half of one percent of cases had liquidated damages computed by investigators and that zero cases had liquidated damages assessed.



FIGURE 1.6a

**Percentage of Re-investigations with Repeat FLSA Violations that Were Assessed CMPs**

Share of all cases (Percent)

Source: WHISARD data. Cases, excluding conciliations, that: 1) were marked in WHISARD as re-investigations with repeat FLSA violations; 2) had minimum wage and/or overtime back wages found due; and 3) were sent CMP assessment letters.

of up to $1,100 for each violation. CMPs are supposed to change employer behavior in the way discussed above: By weighing the potential assessment of penalties, an employer contemplating the "benefits and costs" of complying should become more inclined to comply, even absent a visit from a WHD investigator. This is true only to the extent that the penalty is high enough to produce a deterrence effect.

The FLSA provides for CMPs only where an employer is found to have repeatedly or willfully violated the law. As a practical matter, this typically means that a prior investigation had to have occurred before a CMP can be imposed. Since the majority of employers investigated by WHD are first-time offenders, the number of investigations that assess CMPs as a percentage of all investigations is very low: Less than 3 percent of all investigations 1998-2008 assessed CMPs, but this is in part a reflection of the fact that a large percent of investigations are the first for employers.

Although CMPs are an important enforcement tool available to WHD, they are often not assessed even in the case of reinvestigations that find repeat violations: As Figure 1.6a shows, among reinvestigations where repeat FLSA violations were detected, CMPs were assessed in only about 43 percent of cases. Although that percentage increased in 2007, the majority of repeat investigations do not result in penalties even in the presence of repeat violations.

Analysis of WHISARD data for 1998-2008 also indicates that even when CMPs are assessed by the District Director, the amounts that employers agree to pay are often substantially reduced from the amount initially set. For all cases concluded by the WHD that had CMPs assessed, the CMPs ultimately

determined to be collected by the WHD were only 61 percent of the total amount assessed.[21] The reductions are more striking if we look just at those cases that had CMP assessments reduced. Figure 1.6b shows that for the years 1998 to 2008, those cases that had CMPs reduced were originally assessed an average of $13,899 in CMPs and had those CMP amounts ultimately reduced by an average of $9,218, i.e., reduced by 66.3 percent. The percentage of cases for which CMPs were reduced has declined in recent years, as has the average amount of reduction, which are positive trends. Nevertheless, data from just 2007 and 2008 alone still show that CMP amounts are reduced more than 25 percent of the time and in those cases, the amounts are reduced by close to 50 percent, on average. The limited use of CMPs coupled with their reduction undermines the potential ability of the enforcement system to change employer behavior.

The enforcement trends reviewed above suggest that deterrence effects have declined over the last decade: the probability of an investigation has diminished (whether triggered by a worker complaint or part of a directed initiative) and the monetary penalties beyond back wage payments are relatively small. Given the growth in the number of workplaces and workers over the same period, these trends also suggest that simply trying to "catch up," even with additional resources available, may be difficult, particularly given that employer behavior in many industries may reflect past enforcement conditions for some time. Additionally, the traditional

---

21. WHD policy includes criteria for the District Director to follow in determining possible reductions in CMPs. The fact that the amount of reduction varies quite a bit from year to year, even since 2003, suggests that a review of policies for reducing CMP assessments might be warranted.

**FIGURE 1.6b**

| Fiscal year registered | Total FLSA cases, excluding concilliations | All Cases that Were Assessed CMPs | | | | |
|---|---|---|---|---|---|---|
| | | Number of cases assessed CMPs | Percentage of cases assessed CMPs | Average amount of CMPs assessed per case (Dollars) | Average reduction in CMPs (Dollars) | Average reduction in CMPs (Percentage of original CMPs assessed) |
| 1998 | 29,550 | 451 | 1.53 | 9,173 | 4,291 | -46.8 |
| 1999 | 21,000 | 371 | 1.77 | 10,312 | 4,782 | -46.4 |
| 2000 | 17,698 | 530 | 2.99 | 8,046 | 4,127 | -51.3 |
| 2001 | 18,260 | 478 | 2.62 | 9,440 | 3,682 | -39.0 |
| 2002 | 17,752 | 456 | 2.57 | 5,078 | 1,873 | -36.9 |
| 2003 | 20,043 | 479 | 2.39 | 6,341 | 2,749 | -43.4 |
| 2004 | 19,535 | 441 | 2.26 | 6,965 | 2,836 | -40.7 |
| 2005 | 19,190 | 401 | 2.09 | 9,237 | 3,528 | -38.2 |
| 2006 | 16,517 | 397 | 2.40 | 8,204 | 1,531 | -18.7 |
| 2007 | 15,508 | 434 | 2.80 | 5,125 | 1,360 | -26.5 |
| 2008 | 13,686 | 317 | 2.32 | 3,853 | 737 | -19.1 |
| **Total** | **208,739** | **4,755** | **2.28** | **7,481** | **2,928** | **-39.1** |

| Fiscal year registered | Cases that Were Assessed CMPs but had the CMP Amount Reduced | | | | |
|---|---|---|---|---|---|
| | Number of cases that had CMPs reduced | Percentage of cases that had CMPs reduced | Average amount of CMPs assessed per case (Dollars) | Average reduction in CMPs (Dollars) | Average reduction in CMPs (Percentage of original CMPs assessed) |
| 1998 | 176 | 39.0 | 15,455 | 10,995 | -71.1 |
| 1999 | 104 | 28.0 | 20,441 | 17,146 | -83.9 |
| 2000 | 164 | 30.9 | 16,953 | 13,357 | -78.8 |
| 2001 | 187 | 39.1 | 17,343 | 9,411 | -54.3 |
| 2002 | 148 | 32.5 | 9,778 | 5,771 | -59.0 |
| 2003 | 158 | 33.0 | 12,748 | 8,402 | -65.9 |
| 2004 | 131 | 29.7 | 13,538 | 9,547 | -70.5 |
| 2005 | 138 | 34.4 | 14,368 | 10,252 | -71.3 |
| 2006 | 100 | 25.2 | 12,778 | 6,077 | -47.6 |
| 2007 | 121 | 27.9 | 9,375 | 4,877 | -52.0 |
| 2008 | 86 | 27.1 | 6,169 | 2,715 | -44.0 |
| **Total** | **1,513** | **31.8** | **13,899** | **9,218** | **-66.3** |

Source WHISARD data. Includes cases registered fiscal years 1998 to 2008 and closed by end of FY2009. Excludes conciliations.

enforcement approach focuses on the individual employer or enterprise without regard to how industry and geographic forces affect their compliance behavior. These external forces may be far more powerful than the influence even an aggressive enforcement effort can exert.

Effective enforcement requires an expanded and refined definition of deterrence. Changing behavior in a lasting manner requires changing the benefit/cost calculus (implicit or explicit) that leads employers to choose to violate labor standards. Since many of the factors underlying this assessment operate at the market- or industry-level, effective enforcement must act at higher levels than single investigation-based enforcement is often directed.

## Four Criteria for Evaluating Strategic Enforcement

The central regulatory challenge facing the WHD can be succinctly stated: The WHD seeks to improve compliance with federal workplace standards in an *ongoing and sustained* way by drawing on limited organizational resources to *change employer behavior*. Enforcement policies that take into account both the underlying likelihood of problems and the capacity of the intervention to change employer behavior in significant and lasting ways have the potential of appreciably reducing the number of workers who do not receive the pay they are entitled. Achieving the overall regulatory goal suggests four central principles to guide and measure enforcement policies.

*Prioritization:* For many years, the WHD has focused on a core set of low-wage industries. Ranking industries and workplaces from worst to best is perhaps the most straightforward principle for managing workplace agencies in a world of limited resources. In recent years, through its strategic planning and evaluation process, the WHD has prioritized directed investigations in designated low-wage industries at the regional and national levels. However, since the vast majority of investigations arise from worker complaints, non-directed resources may not match up to those industries or workplaces where workers face the greatest problems. Prioritization gains particular salience when wedded to other core principles. For example, priorities need to be based not only on the probable severity of the problems facing an industry or workplace, but also on the likelihood that an intervention can actually affect behavior (deterrence) or have lasting effects on conditions (sustainability).

*Deterrence:* Evaluations of workplace agencies typically focus on the direct effects of investigations on workplaces. Yet the greatest potential impact of their activities arises through deterrence: the threat of investigation spurring on changes in compliance or practices prospectively. Deterrence is related

to the perception that the expected costs of investigation (in the most simple case, the probability of investigation multiplied by the penalties associated with violations) are significant enough to lead firms to voluntarily comply. Through deterrence, the potential impact on workplaces can be magnified significantly, but only if investigations truly raise the *expected* costs of noncompliance, which arise from both the chance of being investigated and the penalties associated with failure to pay workers what they are due. This means that enforcement procedures must send the consistent message that persistent, egregious, and workplace-wide infractions of the law will be met with significant consequences.

Deterrence effects can also be present beyond the workplaces and individual employers being investigated. For example, if employers in an industry look to other employers in a local area in the process of setting their policies, including human resource practices, an investigation at one workplace can have "geographic deterrence" effects on others. We find evidence of this kind of geographic effect in the eating and drinking and parts of the hotel industry. Since investigation policies can impact how strong these effects are, WHD staff should incorporate consideration of deterrence into their investigation planning and procedures.

*Sustainability:* Workplace investigators, as law enforcement officials, often worry about employer recidivism—that is, the fact that a significant number of those who violate the law once tend to do so again in the future. Sustainability is the mirror image of recidivism: it represents a measure of whether past interventions affect continuing compliance in the long run. Sustainability matters both in gauging the direct impact of investigations (e.g., did the current safety inspection lead the employer to continue to use scaffolding protections on the job site after the present inspection was completed?) and in assessing deterrence impacts (e.g., does the threat of investigations create an ongoing spur to better job-site practices among area employers over time?). Like the problem of "teaching to the test," enforcement strategies are flawed if they focus employers on narrow compliance at the time of the investigation. Enforcement effects can be judged as having greater sustainability if they lead both to lasting compliance and the adoption more generally of employment policies consistent with larger policy objectives, such as internal health and safety policies that both satisfy specific standards and create a preventive injury and illness culture at the workplace. This becomes increasingly important given the greater complexity of workplace risks.

*System-wide Impacts:* Recovering back wages for workers is a critical goal of WHD investigations. However, more fundamental than that is changing the incentives of employers to underpay in the first place. WHD efforts should therefore aim to alter the larger, system-wide incentives for compliance, thereby encouraging all employers to follow the law. Given

the increasingly complex workplace settings described in this section, achieving more system-wide impacts on employer compliance requires investigators to examine how to achieve geographic-, industrial-, and/or, product market-effects. The WHD can do so by finding ways to influence the behavior of firms at the "top" of fissured industries in order to improve compliance at the "bottom" of those industries. The garment initiatives in the late 1990s and early 2000s are an example of this: Through aggressive enforcement and use of the hot goods provisions, the WHD changed behavior among small contractors operating at the bottom of the industry by reaching comprehensive agreements with manufacturers further up the chain.

Creating this kind of system-wide impact can be applied to other sectors with large numbers of vulnerable workers. For example, by identifying wide-scale patterns of noncompliance among different franchisees in various parts of the country, a major brand may be willing to increase its programs to encourage compliance across its outlets, thereby magnifying the effects of investigations carried out at separate franchisees. Bringing an understanding of the impact of these larger factors into the regulatory scheme potentially allows enforce-ment to have systemic effects going beyond the workplaces directly investigated.

## Conclusion

Internal and external factors surrounding the WHD have raised the difficulties—and the stakes—facing the agency in achieving its goals. These problems will not be overcome simply with more resources or with more active application of available penalty policies (although these remain important). Instead, they require a very different framing of basic enforcement approaches. They also require evaluating success with a different set of measures than traditionally used. The next chapter describes in detail the factors driving the growth of the vulnerable workforce in many sectors of the economy. It suggests how understanding these influences can provide a map for enforcement that has more sustainable and system-wide effects on employer behavior. The sections that follow then demonstrate their application in specific sectors and in the realm of complaint investigation policy. In each case, the four strategic enforcement criteria are used to evaluate those approaches.

# CONNECTING THE DOTS
## VULNERABLE WORKERS, FISSURING, AND INDUSTRY STRUCTURE

Over the last decade, more and more workers have become vulnerable to violations of labor standards, workplace safety, and other basic rights in the workplace. The workers of greatest concern to the WHD, however, are not randomly distributed across every sector of the economy. They are concentrated in a subset of industries. In this section, we identify those sectors. We then discuss the characteristics of those industries that help explain vulnerability and identify one factor in particular—what we call the "fissuring" of the employment relationship—as particularly important. "Fissuring" of employment arises in many industries because major companies that in an earlier time period would have directly employed a large workforce, have delegated away employment and the responsibility to oversee the workforce to smaller business organizations, thereby creating more competitive structures among the businesses who directly employ those workers. This splintering (fissuring) of employment leads to conditions that raise the incentives not to comply with workplace policies like the minimum wage and overtime components of the FLSA. But, by recognizing industries' distinctive structures and understanding the reasons why the basic employment relationship in many industries has become fissured between multiple parties, we find insights into how enforcement might be more effectively undertaken.

## The Vulnerable Workforce

Workforce vulnerability can be defined in a variety of ways. In terms of employment security, it refers to the precarious nature of the employment relationships and increased risk of losing one's job. In terms of earnings, it means receiving wages that are close to (or sometimes below) the statutory minimum and subject to de facto reductions via being asked to work "off the clock," without being paid overtime as required by the law or, in extreme cases, simply not being paid for work performed (Shulman 2003, Greenhouse 2008).

Workforce vulnerability also relates to increased exposure to a variety of workplace and social risks. Many have written about the 'great risk shift' occurring over the last 25 years that has moved many societal risks from large institutions of the private and public sectors and placed them on the individual. In terms of occupational safety and health, vulnerability translates into exposure to hazards where there are existing regulatory protections and/or available practices to reduce risk, as well as to risks currently unregulated by health and safety standards such as musculoskeletal disorders, occupational stress, and exposure to a variety of workplace chemicals (Azaroff et al. 2004; Clapp et al. 2007).

More often than not, vulnerable workers do not receive a critical set of workplace- based benefits. According to a 2006 survey (Families and Work Institute 2006), low- wage workers—a reasonable proxy for vulnerability, as will be discussed below—have significantly lower health care coverage; more limited paid time off for sickness, vacation, or holidays; far lower pension coverage (either defined benefit or any form of retirement benefit); and less access to job training programs than middle- or high-wage workers (Families and Work Institute 2006, Table 2).

The vast majority of vulnerable workers do not receive health care benefits from their employers. Among low-wage workers, the DOL's Bureau of Labor Statistics, in its 2007 National Compensation Survey, reported that only 24 percent of workers in the bottom quintile of the wage distribution had employer-provided health coverage, compared to 62 percent in the middle wage quintile. The survey found similarly low absolute and relative rates of coverage for dental and vision

care, prescription drug coverage, and disability insurance (see Boushey et al. 2007).

Few vulnerable workers receive pension coverage. Across the workforce, a shrinking percentage of workers receive defined benefit pension benefits (i.e., pensions with an assured level of retirement benefits linked to a worker's final pay level). The rate of coverage is particularly low among low-wage workers: only 11 percent have defined benefits (versus 34 percent for workers in other wage brackets). Less than half of all low-wage workers have defined contribution programs (43 percent), meaning that most of these workers will be entirely dependent on government-provided Social Security benefits for retirement income (Boushey et al. 2007; Ghilarducci 2008).

Finally, vulnerability relates to treatment at the workplace, including not being afforded adequate protections against discrimination and capricious behavior by supervisors. This directly relates to the decreasing likelihood in most private sector workplaces that one is represented by labor unions. The rate of unionization of private sector workers over the last fifteen years fell from 10.4 percent in 1993 (less than half its rate in post World War II era), down to 7.5 percent in 2007. In industries with large concentrations of low-wage workers, such as food services and drinking, less than 1 percent of workers are union members in 2007.

## Concentration of Workplace Vulnerability

How pervasive is workforce vulnerability in the U.S.? Given the many different dimensions that may be used to describe vulnerable workers, it is difficult to provide a single measure regarding its extent. One reasonable measure defines vulnerability in terms of low-wage work. Low-wage work is usually measured either in terms of earned income relative to what is required by a family to purchase basic needs, or by ranking jobs in the labor market based on the overall wage distribution. Using a definition related to the poverty level, Boushey et al. (2007) estimate that there were about 35 million low-wage jobs in 2006. If one uses a definition based on the broader income distribution, where low-wage work is defined as earning two-thirds (or less) of the male median wage, the number climbs to 44 million jobs.

Although either definition of low-wage work is somewhat arbitrary, both of the above estimates represent a large percentage of total U.S. employment. But the estimates mask the fact that the vulnerable workers are concentrated in certain segments of the labor market. One way to reveal this is to compare the distribution of low-wage jobs against the overall distribution of employment across industry sectors. Using a definition based on the relation of earnings to the federal poverty level, Osterman (2008) finds that retail, food services and drinking places, and health care together account for

more than 40 percent of all low-wage workers.[22] Table 2.1 compares Osterman's estimates of the distribution of low-wage workers with the distribution of total employment in 2006. For example, about 5 percent of all employment in 2006 was in construction, and about the same percentage (4.7 percent) of low-wage workers were found in that sector.[23] Workers in health care segments accounted for about the same share of low-wage workers as they did in the economy as a whole, while a slightly higher share of low-wage workers (11.4 percent) were found in manufacturing than they accounted for in the economy as a whole (9.4 percent).

Table 2.1 demonstrates that several sectors accounted for a disproportionate share of low-wage workers: While retail workers constituted 10.2 percent of the workforce, they made up more than 20 percent of all low-wage workers in the U.S. Similarly, food and drinking services accounted for 6.2 percent of employment but 12.5 percent of low-wage workers; and workers in the accommodation (hotel and motel) and agriculture sectors accounted for up to twice the proportion of low-wage workers that they represented in the economy as a whole.

Sectors with significant concentrations of low-wage workers also tend to have low union density. Retail, food and drinking services, and health care all had levels of union representation that were below the average rate of unionization in the private sector as a whole. The absence of unions in this sector—though a focus of several major union organizing efforts in recent years (Lerner et al. 2008)—reduces bargaining pressures to raise wages and improve working conditions, and also hinders the initiation of enforcement actions arising from worker complaints.

Industries with large concentrations of low-wage workers constituted growing segments of the overall U.S. labor market (see Table 2.2). More than 20 percent of U.S. workers were employed in the retail, and leisure and hospitality sectors, the sectors employing the largest concentration of low-wage workers. These sectors combined were projected to grow by

22. Osterman uses the Current Population Survey (CPS), Outgoing Rotation Group, to make his estimates. The CPS is based on a household survey conducted by the Bureau of the Census for DOL's Bureau of Labor Statistics. The estimates, therefore, pertain to the number of workers employed in low-wage work. This contrasts with the approach used in Boushey et al. (also quoted in the article) that bases estimates on the Current Employment Statistics survey, which, instead of counting workers, counts the number of low-wage jobs. Since some workers may hold multiple jobs, the two measures are not synonymous. The figures for the economy as a whole that are used in Tables 2.1 and 2.2 combine both sources in presenting estimates of total employment.

23. Since the construction industry is made up of subsectors with considerably different characteristics, this figure is somewhat misleading. About 50 percent of construction employment is in the residential sector, which has a much higher proportion of low-wage workers than found in the heavy and highway, industrial, or major commercial construction sectors.

TABLE 2.1

## Distribution of Employment, Low-wage Workers, and Union Density by Selected Industry Sectors, United States, 2006

| Sector | Employment [a] | | Low-wage Workforce Distribution [b] | Union Density [c] | |
|---|---|---|---|---|---|
| | Total employed (Thousands) | Percent of total employment | Percent of all low-wage workers | Percent members of unions | Percent represented by unions |
| Construction | 7688.9 | 5.1 | 4.7 | 13.0 | 13.6 |
| Manufacturing | 14197.3 | 9.4 | 11.4 | 11.7 | 12.5 |
| Retail | 15319.4 | 10.2 | 20.3 | 5.0 | 5.3 |
| Professional and business services | 17551.6 | 11.7 | 9.2 | 2.4 | 2.9 |
| Food and drinking services | 9382.9 | 6.2 | 12.5 | 1.1 | 1.4 |
| Health | 14919.8 | 9.9 | 9.9 | 7.0 | 7.9 |
| Agriculture | 2138.6 | 1.4 | 2.5 | 2.3 | 2.6 |
| Accommodation | 1833.4 | 1.2 | 2.6 | 9.2 | 9.9 |
| All other sectors | 67588.1 | 44.9 | 26.9 | – | – |
| **Total** | **150,620** | **100.0** | **100.0** | **7.4** (Private sector only) | **8.1** (Private sector only) |

Notes:

a. U.S. Department of Labor, Bureau of Labor Statistics. Employment data for wage and salary workers from Current Employment Statistics survey and Current Population Survey for self-employed, unpaid family workers, and agriculture, forestry, fishing, and hunting.

b. Distribution of low-wage workers by Osterman using U.S. Census Current Population Survey, Outgoing Rotation Group survey. Low-wage worker defined by poverty level for a family of four (see Osterman 2008 for additional details).

c. U.S. Department of Labor, Bureau of Labor Statistics, 2006.

almost 1.8 million workers between 2008 and 2018. Food services and drinking (the major component of the leisure and hospitality sector) was projected to grow by about 740,000 jobs over the same period.

## Vulnerability and the Fissuring of Employment

The sources of workforce vulnerability arise from a variety of economic and social factors that have been widely discussed (see Bernhardt et al. 2008 for a recent summary of this literature). These include increasing levels of global competition; a large influx of immigrant (and in many cases undocumented) workers, who are particularly vulnerable to exploitation; changes in the organization of work and in the structures of industries; and long-term declines in enforcement by federal and state government.

Although all of the above factors play significant—although varying—roles, an important source of vulnerability arises

from factors rooted in the sectors where those workers are concentrated, and specifically in how those industries are structured. The interactions of firms in these markets provide important insight into the sources of workforce vulnerability, as well as how those dynamics can be changed through public interventions to improve labor standards conditions for those workers.

In many of the sectors listed in Table 2.2, the key employment relationship has been "fissured" or splintered apart. From the post World War II period through the 1980s, the critical employment relationship was between large businesses and workers in major sectors of the economy. Increasingly, however, the employment relationship has shifted away from those large employers—who continue to play critical roles in shaping competition in the market—and towards a complex network of smaller employers. These lower-level employers typically operate in more competitive markets than those of the firms that shifted employment to them. As a result, the small contractor trying to win drywall work from a national residential homebuilder competes against a multitude of

**TABLE 2.2**

## Employment Trends in Major Sectors, United States, 1998–2018

| Sector | 1998 | | 2008 | | 2018 (Projections)[a] | |
|---|---|---|---|---|---|---|
| | Employment (Thousands) | Percent of workforce | Employment (Thousands) | Percent of workforce | Employment (Thousands) | Percent of workforce |
| Goods-producing (exc. Agriculture) | 24,273.6 | 19.2 | 21,363.1 | 15.5 | 21,390.4 | 14.0 |
| Manufacturing | 17,559.5 | 13.9 | 13,431.2 | 9.7 | 12,225.2 | 8.0 |
| Service providing | 102,351.1 | 80.8 | 116,451.7 | 84.5 | 131,053.1 | 86.0 |
| Retail trade | 14,609.7 | 11.5 | 15,356.4 | 11.1 | 16,010.4 | 10.5 |
| Health care & social assistance | 12,213.7 | 9.6 | 15,818.7 | 11.5 | 19,815.6 | 13.0 |
| Leisure and hospitality | 11,231.6 | 8.9 | 13,458.7 | 9.8 | 14,601.1 | 9.6 |
| Food services & drinking | 7812.7 | 6.2 | 9631.9 | 7.0 | 10,370.7 | 6.8 |
| Accommodation | 1773.5 | 1.4 | 1857.3 | 1.3 | 1,956.7 | 1.3 |
| Retail, health care & leisure/ hospitality (combined) | 38,055.0 | 30.1 | 44,633.8 | 32.4 | 50,427.1 | 33.1 |

Note:
   a. Ten year projections by the Bureau of Labor Statistics: See Woods 2009 for projections; Franklin 2007 for details on methodology.
Source: U.S. Department of Labor, Bureau of Labor Statistics (2009).

other small contractors and the fast food franchisee competes against many branded- and non-branded restaurants in a sub-urban market, creating intense pressure to lower costs, particularly the most sizeable cost and the one most easily controlled: labor. On the other hand, the parties that set many of the conditions of competition—the national home builder or the fast food parent company—operate in environments that afford them more options with which to pursue profitability.

Fissuring (which we sometimes also refer to as "devolution") of this kind has been accomplished via the growing use of a wide variety of organizational methods: subcontracting, franchising, third-party management, changing workers from employees to self-employed contractors, and related contractual forms that alter who is the employer of record or make the worker-employer tie tenuous and far less transparent (Carré et al. 2000; Ruckelshaus 2007; Zatz 2008).

Multiple motivations underlie fissuring and the growing use of non-traditional employment arrangements. In some cases, subcontracting and related forms of devolution arise from a business decision to focus on core competencies while outsourcing activities not central to the firm's operation (Quinn 2000). With the falling cost of coordination arising from information and communication technologies, productive reconfiguring of the boundaries of companies and entire industries naturally occurs (Williamson 2000). This is particularly common in industries

that create intellectual capital, like software development and entertainment. (Simchi-Levi et al. 2003; Dyer and Hatch 2004).

In other cases, employment fissuring arises from a desire to shift labor costs and liabilities to smaller business entities or to third-party labor intermediaries, such as temporary employment agencies or labor brokers. Employers have incentives to do so for obvious reasons: As has been documented in numerous studies conducted in recent years, shifting employment to other parties allows an employer to avoid mandatory social payments (such as unemployment and workers compensation insurance, or payroll taxes) or shed liability for workplace injuries by deliberately misclassifying workers as independent contractors (e.g., Carré and Wilson 2004; National Employment Law Project 2004; GAO 2009).

But there are other, more subtle and fundamental reasons behind the devolution of employment.[24] In the three decades following World War II, employers in major sectors of the U.S. economy (manufacturing, construction, government) employed large numbers of workers directly, through what we still consider to be conventional employer-employee contracts (whether union or nonunion). Employers of such large numbers of workers needed to have unified personnel and pay

────────

   24. A detailed discussion of this issue can be found in Weil 2010 (forthcoming).

policies for a variety of reasons, including to take advantage of administrative efficiencies, create consistency in corporate policies, and reduce exposure to violations of laws. In addition, unified employment policies—particularly compensation policies—reduced frictions between workers (and their negative effects on productivity): Workers operating under one roof communicate and might quickly discover that the person sitting in the next cubicle is being paid more for the same job.[25] Paying individuals who did similar jobs different wages could have deleterious consequences on productivity, increase turnover, or even inspire an organizing drive.[26]

Imagine, however, if a large employer could find a way to pay each worker a wage exactly equal to his or her value of production (or, in economic jargon, match the worker's wage to his or her "marginal productivity"). One way to do this without the internal organizational problems discussed above would be to restructure the way the employer contracts with workers so that the marginal productivity of each worker hired is matched to his/her wage rate, and that the wage rate paid to one party has no impact on that paid to anyone else already employed (or potentially hired if production is expanded). In so doing, the employer could "capture" the difference between the individual marginal productivity and what would be the prevailing single wage rate if it set one. Such a mechanism would benefit the employer over the case where it set a single wage rate for the market as a whole.

What happens, instead, if the large employer subcontracts out the task of "employing" the workers to multiple smaller parties who compete with one another to obtain the employer's business? Each small firm would offer its workers wages to perform work for the central employer, but as contractors to the employer, they would be paid a price for their production (via the subcontractor) rather than be directly paid as individual workers. As such, the larger employer engenders competition for work from different purveyors, and pays them based on its assessment of the contribution. Less efficient producers could be paid less than more efficient producers. In this way, the central employer faces a schedule of *prices for services* rather than *wages for labor*, leaving the unseemly task of compensation to the individual providers of the service or product. In effect, the big player devolves its employment activity to a network of smaller providers. In so doing, it creates a mechanism—a competitive market for services that in the past was handled internally through direct employment—in the form of a network of service providers (subcontractors).

By shifting employment to smaller parties operating in competitive markets, a large employer creates a mechanism to pay workers closer to the additional value they create, but avoids the problem of having workers with very different wages operating under one roof. In so doing, the employer captures the difference between the individual marginal productivity of each worker and what would be the prevailing single wage rate if it set one. Such a mechanism benefits the employer over the case where it set a single wage rate for the market as a whole.[27]

The above story describes the basic structure of many industries that have long been examples of "sweatshops." Major apparel manufacturers since the late 1800s drew on large networks of assembly subcontractors, who offered those larger manufacturers relatively similar services to undertake the most labor-intensive part of production (sewing). But, as we argue below, other industries have restructured to accomplish similar ends. Subcontracting out work has become common in many service industries (janitorial, hotel, landscaping). Construction in the commercial sector has changed dramatically as general contractors, who once directly employed large numbers of basic trades like carpenters, became "construction managers," who subcontracted out such work. Franchising provides a way for very large national businesses to benefit from investments in a brand (which convey larger margins), and at the same time move the problems arising from common wage policies out to a network of independent entrepreneurs.

---

25. An extreme case of this is monopsony, where there is only one buyer of a good or service. In the labor market, an example of monopsony is the company town where virtually everyone works for a single employer. In such a case, the monopsonist faces the entire labor supply, and must pay higher wages if it wishes to increase the number of people employed. As a unitary employer paying one wage rate, each additional worker employed not only raises its costs because of that one employee, but all employees already hired since the company must now match the wages received by existing workers with that paid to the new employee. As a result, the employer hires fewer workers and pays a lower wage to them than would occur in a competitive labor market with multiple employers. This result arises from the need of the monopsony employer to pay a single wage to its workforce. See Erickson and Mitchell 2007 and especially Manning 2003, chapter 2 for a discussion of the classic model of the employer monopsonist.

26. There is a large empirical literature that shows that wages within firms vary far less than one would expect given the existence of considerable differences in productivity among workers (see Manning 2003, Chapter 5 for a summary of this literature). Firms move towards a single wage policy for workers of similarly observable skill/ability because of the negative consequences arising from having multiple rates for workers who otherwise seem similar. Seniority-based pay is one imperfect way to vary wages based on differences in average productivity that strike most as "fair." But "wage discrimination" (à la price discrimination) is rare with large firms. As Manning notes, this is hardly a recent observation. The Webbs noted in 1897 that "the most autocratic and unfettered employer spontaneously adopts Standard Rates for classes of workmen, just as the large shopkeeper fixes his prices, not according to the haggling capacity of particular customers, but by a definite percentage on cost." (Webb and Webb, 1897, p. 281 as quoted in Manning, 2003, p. 132.).

27. Ironically, it would also remove the resource distortion introduced by monopsony since under these circumstances, they would end up hiring additional workers to the point that would be found in a competitive market. However, unlike the situation in a competitive market, the monopsonist would capture the "bonus" received by workers whose wage rate exceeded his or her marginal contribution to production (i.e., the rents of inframarginal workers).

## Vicarious Liability and Further Incentives for Devolution

A second set of factors related to the law governing employment relationships compounds the incentives for devolution discussed above. In particular, common law principles governing torts create peculiar incentives regarding responsibility in situations where one party contracts with another party to undertake activities. Vicarious liability refers to liability imposed upon one party because of the actions of another. Under tort law, according to Arlen and MacLeod (2005, p.4)

> ... vicarious liability hold organizations (and other principals) liable for their agents' torts, committed within the scope of the agency relationship, such as an employer-employee relationship. Organizations generally are not liable for torts by independent contracts, even if committed within the scope of the agent's authority. The central distinction between a master-servant agency relationship and a non-master-servant (e.g., independent contractor) agency relationship turns on whether the principal had the capacity to control the physical conduct of the job ...

Vicarious liability affects the degree to which, in a principal-agent relationship, the principal attempts to influence behavior by asserting more direct control on the agents' activities. Imagine our large employer from the above discussion who decides, rather than directly employing its workforce, to contract with a network of small companies to undertake those activities. The question is how to manage those companies in order to meet its production goals while taking advantage of the competition between them it has created.

Option one would be to treat the individual companies (and their workers) exactly as it would if they directly worked for the major employer: set tasks, monitor progress, evaluate based on performance, and revise plans given performance. In so doing, the employer acts essentially as a joint employer with the smaller firms (in tort parlance, it establishes a master-servant relationship with the contractors). With that role comes liability—vicarious liability—for problems that may arise in the activities of the individual companies it has hired. And those problems may not be limited to potential liability for workplace issues (such as injuries, violations of workplace standards, or discrimination). The employer might also be on the hook for potential damages arising from the activities of its network of producers to other parties like consumers.

For example, imagine that an employer devolves the operation of restaurants bearing its brand and menu to a network of independent businesses who operate those businesses across the country (i.e., it decides to franchise its opera-

tions). If a consumer walks into one of those restaurants, operated by an independent franchisee, and slips on a wet floor, the major employer is potentially partly liable for damages if it can be shown that it had a hand in the day-to-day operational decisions of the outlet.

If the major employer pursues a devolution strategy to solve one set of labor market problems (the problem of paying workers closer to their marginal productivity), it might take on other ones as a result of vicarious liability. To take the above story further, if, by devolving its employment relationships to multiple small companies, it reduces its ability to impose quality or performance standards, it might make itself more vulnerable to claims from workers about discrimination or injured customers than if it managed operations itself. Because vicarious liability says an employer is often at least partly responsible for what its agents do, what an employer might gain from devolution in increased ability to pay multiple wage rates it might lose from exposure to claims.

Tort law provides a potential solution to this dilemma. If a company can show it did not have daily, operational control of the activities of its agents, it cannot be held to be vicariously liable for problems arising from the agents' actions. If a company hires another company to undertake a job in an arm's-length relationship (I will pay you to do a job, and you decide how to do it), there is no master-servant relationship implied by the contract and the principal cannot be held liable for problems created by the independent contractor.

This creates a difficult problem for the major employer. On one hand, an employer always has an incentive to have its network of contractors adhere to a set of standards, practices, and/or procedures central to its business model. On the other hand, it will want to have competition among multiple parties who do the hiring of workers to undertake the task (devolution to match payment with marginal product), while not supervising those activities to such an extent it could be held vicariously liable. Achieving such a balance is no small feat by any means.

This leads to some very complicated and sometimes contradictory incentives. As Arlen & MacLeod note, "... far from encouraging organizations to assert control, vicarious liability often discourages organizations from controlling their agents, even when it would be efficient for them to do so. Vicarious liability discourages the efficient exercise of control because organizations which exert control over agents are likely to be deemed "masters" and thus face liability for their agents' torts." (p.4).

Reluctance to monitor behavior of contracted entities can lead to unsafe streets. For example, in a study regarding the petrochemical industry, James Rebitzer found that a series of major petrochemical explosions and worker fatalities were linked to the use of independent contractors who

were hired by major petrochemical companies to undertake "turn-around" operations, which allow a plant to switch from one type of end product to another (e.g., switching from home heating oil to gasoline production).[28] Rebitzer found that major petrochemical companies who hired contractors to do this work—work in the petrochemical companies' own plants to change the mix of products produced by the facilities—sought to distance themselves from their training and supervision. Despite the potentially devastating impact of improperly performed work, major petrochemical companies sought to insulate themselves from asserting "master-servant" relationships with turn-around contractors in order to avoid tort claims arising from those contractors' activities (see Rebitzer 1995).[29]

In Sections IV and V, we will see how this complex balancing act affects labor practices among the franchisees of internationally recognized and branded companies like McDonald's or Hilton. Franchisors expose themselves to a wider set of liabilities (and potential costs) if they begin to treat franchisee employees as their own. Monitoring payroll records or imposing closer monitoring scrutiny could be interpreted as evidence of a "master-servant" relationship and therefore expose the franchisor to tort liabilities going far beyond the employment relationship itself (e.g., a suit by a customer arising from a franchisee employee who failed to warn customers of a wet floor that led to a fall and injury). In effect, franchisee noncompliance with the FLSA (and other workplace regulations) and its impact on brand reputation may be viewed as an unfortunate but necessary cost to bear relative to the costs arising from a wider range of claims under tort law arising from more stringent monitoring.

## Fissured Workplaces, Vulnerable Workers

The sectors with fissured employment relationships have common characteristics for reasons described above. Rather than a single employer hiring, training, paying, and managing workers—the way that workplace regulations assume—reality looks very different. A person's paycheck may be from one party, yet the person may be managed by an entirely different company (as has become common in the hotel/

28. See also Kochan, Smith, Wells, and Rebitzer (1992) written as part of a wider investigation of the petrochemical incident for the Occupational Safety and Health Administration.

29. Findings by Jin and Leslie (2009) concerning the gap between franchisee and company-owned restaurant hygiene prior to the imposition of mandatory grade cards can be similarly understood through the lens of vicarious liability. The imposition by franchisors of stringent monitoring of outlet hygiene practices could support a claim that they exert a direct role in operational decisions and therefore expose them to liability claims. Franchisee free-riding behaviors (lax hygiene practices) were only reduced by allowing consumers to directly "see" outlet hygiene status in the form of posted restaurant grades.

motel industry). A person may produce goods or services for a nationally known company, yet be paid and managed by another entity wholly unknown to the public (common in many retail and food supply chains). Alternatively, a person may be asked to be an independent contractor (or work for another individual who acts in that capacity) and receive compensation in the form of a percentage of revenues rather than wages.

Fissured industries, for reasons described in the prior section, have distinctive product- and labor-market features. Typically, employment decisions have been devolved from major employers to a complex network of smaller employers. These lower level employers typically operate in more competitive markets than do the companies that "sit on top" of these industry structures. Hence, the small contractor trying to win residential carpentry or masonry work in a small geographic area competes against a multitude of other small contractors, which creates intense pressure for it to lower costs, particularly the cost that most dominates its income statement and is most easily controlled: labor. On the other hand, the parties that set many of the conditions of competition—for example large, national home builders—operate in environments that afford them a variety of options with which to pursue profitability.

Devolved employment plays out into four distinctive structures, depicted in Figure 2.2. The factors pushing for devolution play out in different ways related to the role that central companies play in the industry structure. For example, in the first category, where a strong buyer sources its products through a competitive supply chain, the central player (e.g., a retailer like Wal-Mart or a well-known national brand like Vlasic Pickles or Adidas) plays its role because of brand recognition. Brand plays a similarly important role in the second type of cases, however in these cases, firms provide a service (eating or hospitality services). For each case in Figure 2.2, we indicate the key player, the nature of the "devolved" relationship, the coordinating mechanisms used by central players with their network of contractors, and provide several examples.

***Strong buyers sourcing products in competitive supply chains:*** In some sectors— for example, in many non-durable consumer product markets where retailers play a dominant role in driving supply chains—major players set the overall terms of economic relationships in the product markets (e.g., retailers like Wal-Mart), yet they have no direct employment responsibility for large supply chains that provide products. As a result, pricing policies are set by one group of players who operate in markets where they hold significant pricing power because of scale economies, brand recognition, and geographic barriers to entry. However, the markets (supply chains) providing these goods are characterized by significant competition, low margins, low barriers to entry and therefore, significant pressures

**FIGURE 2.2**

## Fissured Employment Relationships—Four Categories

| Type of Fissured Structure | Central Actor(s) | Nature of Fissured Relationship | Coordinating Mechanisms | Examples |
|---|---|---|---|---|
| **Strong buyers sourcing products in competitive supply chains** | • Lead distributor of product (retailer or lead producer) | • Production supply chain with market and non-market elements | • Market transactions<br>• IT and logistics systems<br>• Standards | • Garment and retail supply chains<br>• Food industry (food processor) |
| **Small workplaces linked together by large branded organizations** | • Branded entity (franchisor; brand) | • Franchising<br>• Management/operating companies | • Franchise agreements<br>• Brand standards | • Fast food<br>• Hotel/motel |
| **Central production coordinators managing large contractor networks** | • Prime coordinator (e.g., general contractor; construction manager) | • Subcontracting to prime business organization | • Bidding<br>• Site management | • Construction<br>• Moving companies/logistics<br>• Entertainment (content) production |
| **Small workplaces and contractors linked together by common/centralized purchasers** | • Public sector purchaser<br>• Primary service user | • Payer of services to network of providers | • Bidding<br>• Payment systems<br>• Evaluation protocols | • Janitorial services<br>• Home health care (state provided) |

for low wages and poor working conditions. Agricultural sectors driven by major food processors, as well as food retailers are examples of this type of industry structure.

*Small workplaces linked to large, branded, national organizations:* In a number of service providing industries—in particular in food services, and hotels and motels—work is undertaken in small, geographically dispersed workplaces. Although these workplaces often operate under the name of well-known national brands (McDonald's, Hilton), the employment relationship is usually with a different entity, such as a franchisee in the eating and drinking industry, or a complicated combination of local owners and third-party management companies in hotel and motels. Conditions leading to workforce vulnerability arise because employment policies for the workers in these sectors reflect the interdependent decisions of relatively small, local employers, who face significant product market competition yet have a lower stake in reputation than the multinational brands of which they are a part.

*Central production coordinators managing large contracting networks:* In this type of industry structure, large companies play a role as coordinators of production that entail large numbers of workers. Few of those workers, however, are directly employed by the coordinators. The U.S. housing market is a prime example of this type of structure, where in the 1990s and first half of the 2000s (prior to the housing bust in 2006), a small number of national home builders (e.g., Pulte) came to dominate many housing markets. Though typical

national homebuilders might have built more than 10,000 homes per year, they directly employed very few construction workers. Instead, construction was undertaken by a large number of relatively small contractors who, in turn, further subcontracted work to other, smaller firms engaged in competitive markets. While the large homebuilders created and managed the plans for development, set the basic terms for pricing, and established standards for performance, terms of employment were set by the myriad of small contractors who undertook the work on site.

*Small workplaces and contractors linked together by common purchasers:* A final variant of this industry structure occurs where a network of employers is tied together by a common purchaser of services, or a public, not-for-profit, or private entity that disperses payments to employers in that network. Vulnerability in this setting arises because services are provided in smaller, more decentralized units whose decisions reflect the concerns of local companies or contractors engaged in far more competitive markets than the larger entities that are the source of revenues. The common purchaser here is neither a coordinator of sales or production, nor a well-known business entity. An example of this type of structure arises in the janitorial, landscaping, and related business services area, where large end users (building owners) contract out these activities to large numbers of competitive contractors. In many cases, prime contractors to building owners further subcontract work to even smaller business entities. A different, but related variant of this model occurs in child care and home health care sectors, where service is provided

by small community-based facilities or at recipients' homes, but paid for via public funds.

## Implications for WHD Policy

In a growing number of industries, the employment relationship has become fissured, requiring regulators to act on webs or networks of employers, not on single, fixed organizations. Fissuring in employment relations further complicates the regulation of workplace conditions described in Section I. Workplace policies in the U.S. assume clear relationships between employees and employers. Those who set workplace policies, supervise production, set schedules, and evaluate workers are assumed to directly represent and report to the owners (private) or responsible parties (public/non-profit) of record. As a result, many of the traditional presumptions underlying workplace regulation no longer hold, which requires a different approach to enforcement.

The enforcement problem in these industries resembles the regulation of a construction worksite—with its many small employers and indirect forms of coordination between owners, project managers, and individual contractor—rather than the stable factory setting assumed by workplace policies. As a result, there is ambiguity around some basic questions:

- Who is the employer (or joint employers) ultimately responsible for establishing workplace conditions?

- How much latitude does the employer of record (e.g., a small janitorial contractor to a large building owner) have to change workplace conditions on behalf of its workforce?

- How useful is the traditional enforcement approach, which focuses on individual establishments or direct employers, to the task of changing employer behaviors and improving workplace conditions?

If workforce vulnerability arises from the distinctive industry-level characteristics described in this section, enforcement policies should attempt to act on and change those conditions in order to have systemic and sustainable effects that go far beyond traditional enforcement approaches focused on individual workplaces. Although interventions relating to other factors relating to vulnerability must also be considered—immigration policies, the need for skill development, increasing opportunities for union representation[30]—a strategic approach to regulation that builds on these insights provides a critical means for changing the underlying conditions driving vulnerability.

Understanding how industry structures relate to the creation of vulnerable work also provides insight into how those same dynamics could be used as a regulatory mechanism to bring systemic compliance to an entire industry rather than on an employer-by-employer basis. We investigate this by describing policies that are—or could be—built around the industry structures described in the following sections of this report.

---

30. Osterman (2008) usefully lays out a framework that delineates policies dealing with low-wage work that recognizes their origins in both labor supply and labor demand. This essay focuses on the nature of labor demand. However, there is a separate and important set of policies regarding education, training, and private and public efforts to enhance the human capital of low-wage workers by focusing on the supply side of the labor market (e.g., Holzer 2004).

# III

## GARMENTS
### LEARNING FROM PAST SUCCESS REGULATING SUPPLY CHAINS

Fissured industries and the problems they create for workers operating in them are not new.[31] Garment manufacturing represents one of the oldest examples of a fissured industry, and the government has wrestled with the task of improving working conditions in garment for more than a century. In 1893, the Committee on Manufacturers of the House of Representatives released a report regarding their investigations of the "sweating system" of production. Among other conclusions, the Committee concluded that 80 percent of production originated in sweatshop production.[32] Several years later, President McKinley appointed a commission made up of members of Congress and private citizens to study the problem. Arising from their study running from 1898-1901, the commission documented extensive abuses including long hours, low pay, and unsanitary conditions.[33] Given this legacy, it is not surprising that enforcing provisions of the FLSA in the garment industry has been an ongoing area of concern since the statute was passed in 1938. The highly competitive markets for apparel and for the workers who cut and assemble products have together made enforcing labor standards a major challenge for the WHD.

Despite these longstanding forces and the long-term employment declines in the domestic apparel industry caused by

growth in imports, data from WHD investigation-based random surveys suggest that WHD initiatives in the late 1990s and early 2000s had large and significant impacts on minimum wage and overtime compliance. Based on an evaluation of investigation-based surveys completed in the garment industry, this section argues that compliance was improved through a combination of private market leverage and public enforcement of monitoring arrangements that were established by the WHD in the New York City and Southern California markets.

The garment initiatives in these markets led to significant improvements in the percentage of employers in compliance with minimum wage and overtime provisions and substantially reduced both the frequency with which violations occurred within garment workplaces as well as the average level of underpayment to workers during this time. The initiatives were also associated with overall improvements in contractor compliance in those markets, over time, as well as increased incentives for compliance as perceived by the constantly changing set of contractors operating in the industry. The garment initiative provides an important and replicable example of addressing the fissured nature of an industry and improving conditions by gaining greater control over the forces acting on employers within it.

## Supply Chains and WHD Approaches to the Garment Industry

Core characteristics of the product and labor markets in the apparel industry push contractors to cut corners with respect to wages, hours, and conditions. In particular, the women's segment of the industry has always been organized around a splintered production system, where different enterprises

---

31. This section draws on research in the following reports and published articles: Weil, Mallo, and Pyles 2003; Weil and Mallo 2003; Weil 2005; Weil and Mallo 2007.

32. See U.S. Congress, House of Representatives, Committee on Manufacturers, "The Sweating System," House Reports, 52nd Congress, 2nd Session, Vol. 1, no. 2309, 1893, pp. iv-viii.

33. Reports of the Industrial Commission on Immigration and on Education. Washington, D.C.: Government Printing Office, 1901, vol. XV. A discussion of the history of regulating labor standards in the apparel industry can be found in Abernathy, Dunlop, Hammond, and Weil (1999), Chapters 2, 10, and 15.

carry out the design, cutting, and sewing and pressing/packaging of apparel products.[34] For example, a "jobber" may sell a design to retailer, and then contract with a manufacturer for delivery of the product. The manufacturer, in turn, may purchase and cut the product, but then contract out sewing to one or more companies (which may, in turn, further contract out sub-assembly). Contractors compete to preassemble bundles of cut garment pieces in a market where there is little ability to differentiate services (i.e., sewing and associated assembly) except for some operations requiring higher levels of skill content. The structure of relations from the retailer down to contractors and subcontractors is depicted in Figure 3.1.

In general, as one goes to "lower" levels of apparel production (i.e., from design and cutting by manufacturers or jobbers at

34. In the U.S., men's clothing—from the 1920s onward—is primarily produced in factory-type settings, with manufacturers designing, cutting, sewing, pressing, and packaging products.

the top of Figure 3.1, to sewing by contractors or subcontractors at the bottom), the level of competition intensifies and profit margin per garment diminishes. Sewing contractors—often themselves former sewers/cutters and recent immigrants to the U.S.—compete in a market with large numbers of small companies (on average 25-35 workers each in the women's industry), low barriers to entry, and limited opportunities for product differentiation. This creates conditions for intense price-based competition. Because labor costs represent the vast majority of total costs for a sewing contractor, there is great pressure to strike deals with jobbers and manufacturers that would not be economically sustainable if the contractor actually complied with wage and hour laws.

Labor market conditions also tend to push wages towards the legal minimum or below. In the women's segment, many entry-level sewers can reach the standard rate for sewing in a matter of months, making it relatively easy to substitute workers in the event of turnover. Given its low skill barriers,

**FIGURE 3.1**

## Garment Industry Structure



the apparel industry has always been attractive to immigrants (e.g., Slovaks, Germans, and Jews at the turn of the century; Hispanic, Chinese and Asian workers today).[35] The ample supply of workers and the relatively low skill level required of sewers keep wage levels low and the incentive to work long hours—even in inhospitable work environments—high. The illegal status of many workers, language barriers, and cultural norms further undercut the bargaining power of these workers (Kwong 1997).

Market forces began to reshape the apparel industry, however, beginning in the early 1990s, particularly involving the relations between retailers, apparel manufacturers, and textile producers. "Lean retailing" takes advantage of information technologies, automation, industry standards, and management innovations to align more closely orders from suppliers with real-time sales data. This system reduces the need for retailers to stockpile large inventories of a growing range of products, thereby reducing their risks of stock-outs, markdowns, and inventory carrying costs. The companies that have adopted lean retailing principles now dominate major retail segments. In contrast to the infrequent, large bulk shipments between apparel manufacturers and retailers under traditional retailing, lean retailers require frequent shipments made on the basis of ongoing replenishment orders. These orders are made based on real-time sales information collected at the retailers' registers via bar code scanning. SKU-level sales data are then aggregated centrally and used to generate orders to suppliers, usually on a weekly basis for each store.

Retailers operating with the systems described above require frequent replenishment and demand that shipments meet standards concerning delivery times, order completeness, and accuracy.[36] Lean retailing, therefore, changes the problem faced by an apparel supplier. Suppliers must replenish products within a selling season, instead of between selling seasons, with retailers now requiring replenishment of orders in as little as three days. Lean retailers are vulnerable to disruptions to the weekly replenishment of retail orders by apparel suppliers. Such disruptions are a major problem for retailers and can lead them to penalize suppliers, cancel orders, and even drop suppliers altogether. Given that retailers drive the dynamics of the apparel markets depicted in Figure 3.1, the increasing importance of timeliness translates into a potential tool of regulatory enforcement.

## A New Approach to Enforcement

State and federal enforcement historically focused at the contractor and subcontractor levels of the apparel industry. The WHD and state labor agencies attempted to increase compliance with labor standards by directly investigating contractor shops and creating incentives for both investigated and non-investigated shops to comply by levying CMPs for those found in repeat violation.[37] Significant investigation resources were applied to the garment sector in the 1990s. Yet the large number of contractors still meant that the average annual probability that a given contractor shop received a WHD investigation was below 0.10.[38] CMPs incurred by a typical garment contractor during the same period were $1,086 per contractor.

Using data from investigation-based compliance surveys of randomly-selected contractors (see below), we estimate that a contractor with 35 employees owed approximately $11,850 in back wages annually.[39] Given the modest investigation probabilities and CMPs, such a contractor has a very high incentive to underpay workers, even when faced with multiple investigations over time. In fact, the incentives for noncompliance are large enough that an employer will choose noncompliance even if found in violation of minimum wage requirements in the first period and therefore facing a higher probability of investigation and CMPs in the subsequent period.[40]

In response to the agency's inability to appreciably improve compliance in the industry despite devoting to it a relatively significant amount of resources, the WHD began to alter this regulatory model substantially in the mid-1990s, partly in response to the changes in the apparel industry mentioned above and the egregious violations at a garment shop in El Monte, CA. The WHD shifted its enforcement focus from targeting individual contractors to exerting regulatory pressure by invoking a long-ignored provision of the FLSA, Section 15(a). Under this section (the "hot cargo provision"), the WHD can embargo goods that have been manufactured in violation of the Act. Although this provision had limited impact on the traditional retail-apparel relationship, when long delays in

---

35. See Commons (1901) in Part III of the Industrial Commission report entitled "Immigration and Its Economic Effects."

36. This model of retailing has also become common in many other segments, most strikingly in food retailing, where strategies such as "Efficient Consumer Response" seek to similarly reduce inventory exposure through use of point-of-sale information, efficient logistics, and replenishment programs for perishable and non-perishable products.

37. Most academic studies of FLSA compliance (particularly of minimum wage) focus on this aspect of government interventions. See Ashenfelter and Smith (1979); Grenier (1982); Chang and Erlich (1985); and Yaniv (2002).

38. This is based on the following calculation: In the late 1990s, there were roughly 10,000 establishments in the segments of the apparel industry that are the focus of WHD regulation (primarily the women's and to some extent the children's industry). Given that there was an average of about 800 investigations conducted annually by WHD investigators between 1996 and 2000, the annual probability of inspection is about .08.

39. This estimate is calculated by taking the average back wage owed per worker per week for the subsample of contractors who had not been inspected prior to the time of the randomized survey by the WHD. This estimate is then annualized and applied for a shop employing 35 workers.

40. The detailed calculations behind these conclusions can be found in Weil 2005.

shipments and large retail inventories were common, invocation of the hot goods provision today (given the short lead times of retailers) potentially raises the costs to retailers and their manufacturers of lost shipments and lost contracts. The embargo of goods may create consequences for FLSA violations that quickly exceed the costs of back wages and CMPs owed. In effect, the ability to stop the flow of goods creates significant private penalties associated with the market-based costs of failing to deliver orders in a timely manner.

As a vital part of this policy, the WHD used the threat of embargoing goods to persuade manufacturers to augment the regulatory activities of the WHD. It did so by making the release of embargoed goods contingent on the manufacturer's agreement to create a compliance program for its contractors and subcontractors as well as to assure that back wages owed to workers are paid (either by the contractor or manufacturer).[41] Under the compliance program, the manufacturer agrees to sign two types of agreements: one between the manufacturer (or jobber) and the DOL; and another between the manufacturer and its contractors. The agreement between the DOL and the manufacturer stipulates the basic components of a monitoring system that will be conducted by the manufacturer.[42] The provisions of this agreement include explicit top management commitment to: uphold the FLSA; screen new contractors concerning prior history of FLSA compliance; establish a monitoring system; guarantee back wage payment and a formal remediation process; and inform and train contractors regarding their responsibilities under the law.

The second set of agreements are between the manufacturer and all of its contractors. These agreements set out the specific FLSA requirements; clearly define the terms and methods of computing wages and overtime (the subject of some ambiguity given that much of the industry uses piece rate payment); establish specific procedures for tracking payroll records, time cards, and the use of time clocks; and lay out other administrative procedures related to the contractor's compensation policies.

## Measuring Regulatory Performance

Data collected over time through investigation-based random surveys provide a means to evaluate the impact of new strategies adopted by WHD specifically for improving compliance in garment manufacturing. The data for the following analysis arise from four investigation-based random surveys of apparel contractors operating in Los Angeles/Southern California (1998 and 2000) and the New York City area (1999, 2001). The surveys were conducted by the WHD using a randomly-selected set of establishments in the Southern California and New York area apparel markets.[43] Contractors selected from the list were subject to full investigations by WHD investigators that included employee interviews, a review of time cards and payroll records, and other data collection for a designated time period (typically two years).[44]

### MONITORING IMPACT

Compliance program agreements entered into by the WHD at both the manufacturer and contractor levels stipulate a method of formal monitoring to be conducted by the manufacturer (or its designated third party). In a model program as described by the WHD, manufacturers would undertake unannounced monitoring visits "… at least once every 90 days." In the course of the visits, monitors would review contractors' payroll records and time cards; undertake piece counts (important for translating piece rate payments into hourly earnings); interview employees in private; advise contractors of compliance problems; and undertake training for contractors and/or their employees (U.S. DOL, 1998; 1999).[45]

---

41. These agreements are known as Augmented Compliance Program Agreements (ACPA). The ACPA contains within it a Program to Monitor Contractors that includes various provisions regarding contractor monitoring (discussed below).

42. These agreements, however, are entered into voluntarily by the manufacturer and their terms are therefore negotiated out between the government and the manufacturer/jobber. The terms described here are taken from the DOL's model agreement language specified in formal policy documents (see WHD, 1998).

43. Total sample sizes for the four surveys were 77 and 67 in Southern California (for 1998 and 2000 respectively); and 67 and 91 in New York (for 1999 and 2001). Apparel manufacturing and contractor firms appearing in the California and New York manufacturing registration lists for each year constituted the universe for the surveys. The registration lists for apparel consist of "… all persons or firms engaged in the business of apparel manufacturing …" where apparel manufacturing is defined as "… sewing, cutting, making, processing, repairing, finishing, assembling, or otherwise preparing any garment or any article of wearing apparel or accessories designed or intended to be worn by any individual …" See Weil, Mallo and Pyles (2003) for further details.

44. The WHD also selected a random sample among previous violators in order to see the evolution of the behavior of those who had already been found to violate FLSA regulations. The performance of prior violators (recidivists) is not our focus here (see Weil and Mallo 2003 for analysis of the recidivist group).

45. Model agreements also require that back wages are paid to workers: "Whenever the FIRM finds any act or omission by a Contractor that violates Sections 6 and/or 7 of the Act with respect to any work on any goods that the FIRM has shipped during the term of this ACPA or will ship during the term of this ACPA, the FIRM will immediately i) suspend all shipment of goods affected by such violations until all such violations affecting the goods have been remediated … and ii) cause … the payment of all unpaid back wages resulting from any violations of Section 6 and/or 7 of the Act by the Contractor … and do so in an amount approved by DOL …" The agreements may also provide for a more advanced set of monitoring arrangements and work practice agreements including the use of electronic time clocks and an agreement not to subcontract work without prior approval of the manufacturer. (WHD regional offices in New York and California frequently use the FCPA, a slightly shorter version of the ACPA.)

---

In the course of the Southern California and New York programs, the WHD negotiated many agreements with manufacturers, leading contractors operating in those areas to be covered by a variety of arrangements. These are depicted in Table 3.1, which lists the different provisions for monitoring and their frequency among the contractors in the random samples for both markets. Some provisions were very common among the sample (e.g., required review of time cards by the manufacturer undertaking monitoring). Others were less common (e.g., manufacturer recommendation of corrective action or conducting unannounced visits of contractors).

Although there are many potential combinations of the different monitoring activities, certain combinations of activities were found to have potentially larger impacts on contractor

behavior than others. We focus below on specific combinations of monitoring activities that reflect the stringency of monitoring arrangements under which a contractor operates (lower portion of Table 3.1). First, we examine the impact of the presence of "any monitoring"—that is, contractors who report that at least one of their manufacturers is conducting at least one of the seven monitoring activities listed in Table 3.1. About 60 percent of the contractors in the New York sample in 2001 and over 70 percent in Southern California in 2000 had "any monitoring" in place.

In contrast, "comprehensive monitoring" is defined according to the presence of two specific monitoring features out of the seven: both payroll review by the manufacturer and the manufacturer's ability to conduct unannounced inspec-

## TABLE 3.1

### Types of Monitoring Agreements and Arrangements: Southern California 1998/2000; NYC 1999/2001

| | Southern California 1998 | Southern California 2000 | New York City 1999 | New York City 2001 |
|---|---|---|---|---|
| **Monitoring Activity Employed by Manufacturer** | | | | |
| Manufacturer reviews payroll | .66 | .53 | .43 | .52 |
| Manufacturer reviews time cards | .73 | .60 | .43 | .54 |
| Manufacturer conducts employee interviews | .62 | .50 | .30 | .40 |
| Manufacturer requires contractor to provide minimum wage information to workers | .65 | .52 | .28 | .37 |
| Manufacturer discloses problems with practices to contractor | .32 | .42 | .11 | .25 |
| Manufacturer recommends corrective action to contractor | .31 | .42 | .16 | .27 |
| Manufacturer may conduct unannounced visits | .55 | .58 | .29 | .42 |
| **Type of Monitoring** | | | | |
| **No monitoring:** No monitoring activity among any of the manufacturers for which the contractor currently works | .211 | .29 | .443 | .403 |
| **Any monitoring:** One or more monitoring activities by one or more manufacturers | .789 | .71 | .557 | .597 |
| **Comprehensive monitoring:** Payroll review and unannounced inspections* | .239 | .307 | .241 | .373 |
| Number of observations | 71 | 62 | 79 | 67 |

Note: *Because of differences in the survey questions used, comprehensive monitoring is measured as the presence of both features at all manufacturers for which a contractor currently works (Southern California) or at least one current manufacturer (New York).